FILED

OCT - 5 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Ivan Kenneth King
8613 Lonicera Court
Brandywine, MD 20613
(301) 782-4443

V

McKee Nelson LLP
1919 M Street NW, Ste. 800
Washington, DC 20036

CASE NUMBER   1:05CV01967

JUDGE: John D. Bates

DECK TYPE: Employment Discrimination

DATE STAMP: 10/05/2005

COMPLAINT

I (IVAN KENNETH KING) HERBY FILE A COMPLAINT OF RACIAL DESCRIMINATION HARASSMENT, RETALIATION, AND SUBJECTION TO HOSTILE WORK ENVIORMENT AGAINST MCKEE NELSON LLP.

Listed below is a full statement of the facts relative to this complaint.

1)   Hired in October, 2000 as a Records Coordinator – reported to James Lent (white manager) who knew nothing about records management, for 2 years. Having to do the job, I was hired to do and teach him at the same time proved to be stressful and overbearing. During this period, I ran two primary functions within the firm, management of the firms overall records program and the New Business/Conflicts' operation. During this period I was subjected to not being able to use leave or vacation, without proper support from my manager James Lent. When I did take off or went on vacation, I was constantly disturbed by phone calls from James, about how to do things. Despite James' lack of knowledge of the operation, he was allowed to remain my direct report, until January 2003. He and another white manager (Al Roth), were often given credit (full) for projects in which I either planned or was very involved with planning

**Item:** In March of 2001, McKee Nelson moved from 1150 18th Street, DC, to its current location 1919 M Street, N.W. Because the move involved the relocation of files (i.e., boxes, documents, etc.), and file cabinets, I was asked by James Lent to assist in planning for the move. During a meeting with James Lent, Al Roth, and George McCallum (who was the Director of Administration at the time. I expressed that I had a lot of experience at doing office moves of this nature, which I had done with previous law firms, I was employed with they expressed that neither of them had done this before I drafted out a move plan, which was adopted by James, Al, and George and incorporated into initial move plans. The firm hired a move coordinator to facilitate the move. During a meeting with the coordinator, George McCallum, Al Roth, James Lent, and me along with representative from EY (Ernst & Young), who oversaw the leased space. The move coordinator presented his move strategy/plan to the group, which included a plan for moving the files at which point I explained that I too had a plan for moving the files. I presented my plan to the group and the move coordinator, as well as, the rest of the group liked my plan better. They agreed that my plan should be used in place of the coordinators plan, and it was done. The firm (McKee Nelson) moved into the new office during which period I worked countless hours, while sick with the flu, in an effort to fulfill my commitment to the project. The move was smooth and praise was given to George, James and Al Roth by the owners of the firm for doing such a fine job. I wasn't included in their acknowledgement of those who were instrumental in the project. I was, however, given the standard gift certificate, which was given to "anyone" who assisted in the office relocation move that weekend. However, James Lent and Al Roth received a "cash" award in addition to the gift certificate to the "Palm Restaurant". A few days later in a staff meeting George McCallum praised and thanked both James and Al for making the move a success, but failed to mention me at all, until he was reminded by Lizz Dixon (Human Resources Manager), that Ivan was involved too. At which point, he said, "Oh yeah, and Ivan."

**Item 1b:** On February 1, 2003, I was promoted to Records Manager by Joseph Bracewell (Chief Executive Director), after having worked in that capacity for 2 years. IN anticipation of the salary increase and other benefits associated with my promotion, I went to J. Bracewell and asked him, when would I see the adjustment in my pay, and what was the amount. I was told by Mr. Bracewell, to see George McCallum who was now the firms' director of finance. A few days later, I stopped by George's office after leaving several

messages notifying him that Mr. Bracewell had instructed me to come and talk to him about my salary adjustment. I sat down, and at which point, George said, "You're going to be receiving a considerable increase in salary"! What are you going to do with all that money!" Needless to say, I was very much taken back by his comments. But, my reply was that 'I had worked very hard to get to where I was and deserved the promotion! There wasn't a following response from George. He explained to me that he hadn't finished with the adjustment to my salary, but that I would be very pleased and that I would receive my notification in the mail with the rest of the McKee Nelson employees on January 9, 2003.

I received the letter, a few weeks later, and stunned to see that my salary had only been increased by $6,000.00, which included my year-end salary increase. My salary before the promotion was $46,000.00 (as a Records Coordinator) after the promotion it was $55,000.00. The amount was far less than the salary suggested by the ALA (Association of Legal Administrators, which based upon my experience level, size of firm and responsibilities, should have been $63,250.00 to $71,250.00. The proposed was also lower than the base salary of my white counterparts, which was communicated to be $75,000.00 by a partner joining the firm, who was (Ed Gainor). Ed Gainor was told this by George McCallum.

I went to Mr. Bracewell and explained to him that the salary I received wasn't consistent with that which I had been told by fellow managers Camille Brooks and Gladys Moore. I gave Mr. Bracewell documentation from research that I had don on the salary requirements for the Records Manager position. I was given this documentation from a friend who is the Director of Human Resources at a large Washington based law firm. The documentation included salary surveys for Record Managers from the 2002 ALA Capital Chapter. After reviewing the documentation, Mr. Bracewell informed me, that he would have to take the matter up with George McCallum. A few weeks later, I was informed by Mr. Bracewell that my salary had been readjusted to $60,000.00. I didn't receive a formal letter acknowledging the adjustment from the firm.

**Item 2**

**Hostile Work Environment**

During my tenure at McKee Nelson, I have experienced harassment, hostility, defamation of character and uncooperative attitude from any of the white managers and directors. In a memo to Joseph Bracewell, on November 19, 2002, I pointed out may concern, that Al Roth was creating an extremely difficult working relationship between him and I, though his unprofessional conduct and negative comments about me to staff and vendors. Please see the attached memo which outlines the complete event. I never received a formal response from Mr. Bracewell, with regards to the memo; despite having met with to verbally confirm his receipt of the memo and notifying him of the continued unprofessional behavior on Mr. Roth's part. To this day, I still experience this same type of conduct from Mr. Roth with no resolve in sight.

Continued harassment and uncooperative work attitude from a white director Mark Vitalie.

While working at McKee Nelson, I have experienced a reluctance on the behalf of several white administrative staff, most notable, Mark Vitalie (Director of Information Technology) which has made my job more difficult, stressful and has had adverse effects on projects and initiatives created by me to aid the firm in serving its clients and operating in a manner consistent with industry standards.

The problems with Mark Vitalie began when he was brought in to head the IT department. When I would engage him in assistance on a problem or concern, he would give me a very evasive answer, and I often left with no resolve. However, he was a lot more supportive with his white counterparts. I observed this on a number of occasions. This behavior on Mark's part was also experienced by other black managers at McKee Nelson. Both Gladys Moor and Camille Brooks had shared the same treatment from Mr. Vitalie. So much so, that they both went to Mr. Joe Bracewell and told him about Mark Vitalie's behavior.

The situation with Mr. Vitalie got worse, after I began to oversee the firms' office services department in April 2002. As a part of my responsibilities, there was an immediate need to improve the quality of reproduction in the copy center and throughout the firm. I asked Mark if we could network the copiers. He said no, because it would create too many problems. I asked him, why not? He replied, because he wasn't. With the assistance of one of his staff persons I was able to network several of the copiers. I then began to seek the purchasing of new copiers for the copy center, because there were technical considerations, I asked Mr. Vitalie if he wanted to attend the sales demonstration at the Xerox showroom. He never responded to my email message. The equipment was purchased and installed a few months at the approval of Mr. Bracewell and Edward Gainor, a partner at the firm.

Several weeks prior to taking possession of the new copiers, I informed Mr. Vitalie of their impending arrival and that I would need the assistance of his department to complete the installation/set-up process. He told me that I was on my own. I made arrangements with technical support team at Xerox to provide assistance to the McKee Nelson IT Group to finish the installation and set up. Mr. Vitalie was reluctant to work with Xerox and getting the set-up finished. This went back and forth for some time until it became more than apparent that I needed support from someone above him. I then went to Mr. Bracewell and informed him of Mark's unwillingness to assist in the proper setting up of the copier. And as a result, it was creating problems for one of the top billing practice areas (securitization) and that something needed to be done.

Mr. Bracewell met with Mark and instructed him to complete installation (see memo dated 2/3/03 – Xerox multifunctional devices). I was asked by Mr. Bracewell to give Mr. Vitalie any additional installation documentation he needed to complete the project. The next day, I went to Mark's office to give him the additional documentation. Mark was sitting in his office with his assistant Dave Yen (IT Manager). I told Mark that I was there to give him the installation material. He reached out, took the material and as I walked away (still looking at him), he threw the documents on the floor. He and Dave began to laugh, as I walked away.

On Thursday, February 20th, the situation got worse, when I received a threatening phone call from Mr. Vitalie. The situation started when I received a request from a legal assistant to help to produce copies of a time sensitive document.

Because of technical problems experienced while printing the documents, I called the IT department for assistance. Dave Yen answered the phone and I began to explain to him the problem I was having with printing the document and it was a very time sensitive project, which is pretty fair assessment of the incident. After the conversation with Mark, I was very upset, nervous and disturbed. I felt that my job was in jeopardy, even though I had done no wrong.

I took all of his threats seriously and felt that because he was "white" he would be given preferable treatment. His mentioning of telling my "new director" Ken Beaver, who he appeared to have a good relationship with and who just days prior requested a change in my work schedule (i.e., overtime, without asking me what the requirements were for me working Overtime and the needs of the firm. My feelings of mis-trust, and unfair treatment by Mr. Beaver were further supported by an email message which was circulated by George McCallum and Mark Vitalie inviting Ken Beaver to join them for lunch to get a jump on starting "The good old boys network going"!.

Fearing that Mark would go to Ken Beaver and fabricate a story, which would be unfavorable to me. Thus, giving Ken the opportunity to go to Joseph Bracewell with the same story. I called Mr. Bracewell at home right after hanging up with Mark. I informed him of the incident between Mark and me and gave him a step by step recap of the entire event. I told him that I scheduled to be on vacation for the next several days and that I had an early morning flight. I asked him if he could remain neutral until I returned from my vacation and return to the office. He told me to go on with my vacation plans and that he'd talk to me when I got back.

My wife and I went on with our vacation plans to Cancun, Mexico. The vacation was scheduled for 5 days. However, I was so stressed by the events associated with the incident with Mr. Vitalie, I couldn't relax and enjoy my vacation. I also wasn't sure about my job status, upon my return to the office.

Upon returning to the office, I officially met with Mr. Bracewell, Lizz Dixon and Ken Beaver to discuss what had taken place with Mark. I received a call from Joe Bracewell, in which he told me the results of the investigation which are outlined the memo from Mr. Bracewell (dated 3/28/03 – your complaint). Although the situation appeared to have been

addressed, I wasn't at all pleased with the outcome. I felt that Mark received preferable treatment, that as a "Black" employee if I had done the same, I would've been fired. As was the case, when Will Hinton (former 'black' McKee Nelson employee) was fired by George McCallum (the then firm administrator) for threatening a fellow employee, who was also Black.

Although the memo stated that there was not to be any retaliation on Ken Beaver, Mark Vitalie and David Yen's part against me for making the compliant. My working relationship with the three of them remained difficult and they continued to harass me.

In a meeting scheduled by Ken Beaver, with myself, Mark Vitalie and David Yen to devise a plan to resolve and improve the quality of documents produced by the Xerox copiers. I opened the meeting by expressing what the customers' needs were and that with the assistance of the Word Processing Manager; Camille Brooks had created a successful formula for producing these documents consistently. I showed them samples of the documents produced by me and Camille. They glanced at them and after that, the direction of the meeting changed. Mark, Ken and Dave began to talk about how lousy the Xerox equipment I had purchased was and that Xerox was lousy with bad products and poor customer support and that they would never by stock in the company. I realized what was going on and that I was basically being ambushed by the three individuals who were instructed by Mr. Bracewell not to retaliate against me. I asked them, if they were finished with meeting. They replied, yes with smiles on they're faces. I excused myself from the meeting and went to my office to contemplate what I should do about what had just happened. I was reluctant to take the issue to Joseph Bracewell, because just prior to receiving the memo (March 28, 2003 from Joseph Bracewell – your compliant) regarding the results of the investigation. I met with Mr. Bracewell and Lizz Dixon, as a follow-up to the first meeting after the incident with Mark Vitalie.

During that meeting, I had expressed concerns about still not getting the proper support from Mark and the IT Department and that Ken Beaver didn't seem interested in supporting me to correct the problem. I was then asked by Mr. Bracewell, "Do I have a beef with Ken or something?" I replied, absolutely not, I don't have a beef with anyone! I'm just trying to help these attorneys get what they need to service their clients.

I now felt like I had no place to turn, having followed standard office protocol.

In an email dated 3/17/03 – Relinquishing of Volunteer Office Services Responsibilities, to Ken Beaver, Joseph Bracewell, I resigned from my responsibilities of overseeing the office services operation which was based on the tremendous amount of stress, impartial support and, non-compensation (which was requested by Joseph Bracewell in the memo dated 12/16/02 – Recognition of Ivan King for the work responsibilities which had been performed. The memo to Lizz Dixon from Joe Bracewell encouraged the changes in job description, title, salary, etc. for the oversight of office services department. I never received any adjustment in salary, with regards to the services I provided.

In closing, it is my belief that McKee Nelson is a firm that promotes discrimination against blacks & other minorities and that despite being qualified to do a job, we are treated unfairly. I'm one of 'only' two "black managers" employed by McKee Nelson, at the time my complaint was filed with the EEOC. All of the other 'black' managers had either been released or asked to step down from their manager (e.g., Camille Brooks, Gladys Moore, and Gloria Hill) positions under very abnormal circumstances.

As relief for the complaint, I would like for these terms to be met by McKee Nelson LLP.

1. Salary compensation in the amount of $30,000.00 for salary, wages, and bonuses not received while performing multiple job responsibilities, from March 2001 through March 2003.

2. Payment of Medical expenses in the amount of $4,000.00 incurred, as a result of mental stress stemming from McKee Nelson LLP.

3. Payment in the amount of $7,000.00, for Legal fees associated with suit.

4. Payment in the amount of $100,000.00, for mental anguish, pain, and suffering.

5. Separation Agreement - two (2) years salary compensation of $ 150,000.00 (75K per year). Three (3) letters of recommendation from, Joe Bracewell (Executive Director), Will Nelson (Owner), William McKee (Owner). A 'NO' disclosure clause, with regards to 'ALL' matters between Ivan King and McKee Nelson LLP.

6. One year of 'FULL FAMILY' Medical Coverage for one year to be paid by McKee Nelson LLP.

Ivan Kenneth King
8613 Lonicera Court
Brandywine, MD 20613

EEOC Form 161 (3/98)                    **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: Ivan K. King  
8613 Lonicera Ct.  
Brandywine, MD 20613

From: Washington Field Office  
1801 L Street, N.W.  
Suite 100  
Washington, DC 20507

[ ] On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 100-2005-00298 | Janet Stump, Acting Enforcement Supervisor | (202) 419-0700 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Dana R. Hutter* (signature)        JUL 0 5 2005

Enclosure(s)                Dana Hutter,  
                            Director                (Date Mailed)

cc: Dora V. Chen                    E. Lindsey Maxwell II         05 1967
    Bredhoff & Kaiser               Guydon Clarke & Robinson, LLP
    805 15th St., N.W.              1717 K St., N.W.              **FILED**
    Washington, D.C. 20005          Suite 600
                                    Washington, DC 20036          OCT - 5 2005

                                                                  NANCY MAYER WHITTINGTON, CLERK
                                                                  U.S. DISTRICT COURT